**Affirmed and Memorandum Opinion filed August 4, 2022.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-22-00224-CV

_____

## IN THE INTEREST OF K.D.T. A/K/A K.T., A CHILD

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2020-00053J**

## MEMORANDUM OPINION

In this appeal from a judgment terminating the parent-child relationship, the Mother argues that the evidence is insufficient to support the trial court's predicate finding that she failed to comply with the terms of her service plan, as well as the trial court's other finding that termination was in the Child's best interest. For the reasons given below, we conclude that the evidence is sufficient to support both findings, and we affirm the trial court's judgment.

## BACKGROUND

The Child, a girl, was born in September 2017. In August 2019, the Department received a referral that the Mother's supervision of the Child had been neglectful. The referral indicated that there was a domestic disturbance between the Mother and her paramour (who was not the father), and that the paramour had pulled out a gun and fired several shots into the ceiling. No one was injured during the incident, but the paramour was arrested. A safety plan was put in place, and the Mother agreed to cooperate with the Department.

The Mother did not cooperate, however. She walked out of a meeting with the Department and declared that she could take better care of the Child than anyone else. She ignored phone calls from the Department, and she refused to respond to text messages and voice mails.

The Mother eventually informed the Department that she did not believe that she required any services. The Mother agreed to a home visit, but when the Department arrived, no one was there, and the front yard was littered with trash. The Department attempted another home visit at a different location, but no one was there either.

An attorney ad litem made face-to-face contact with the Mother, and he expressed concerns about her living conditions. The ad litem learned that the Mother and the Child were sleeping together, which he indicated was not a safe practice. He also discovered that there was trash in the backyard of the home, which presented a danger to the Child.

After a hearing, the Mother was ordered to attend parenting classes, to take the Child to a pediatrician, to obtain a suitable bed for the Child, and to remove the

trash from the backyard. The Mother was also ordered to not allow any person to use illegal drugs in the home or around the Child.

At a follow-up visit in November 2020, the Department learned that the Child had been provided a cot, which she used for sleeping. But the Department also discovered that the Child had marks on her hands and legs, which the Mother could not explain.

Later that same month, the Department received a second referral of neglectful supervision. This referral alleged that the Mother became angry when she learned that her paramour had been entertaining another woman. The Mother allegedly broke into the paramour's house, stole certain items, and pepper-sprayed the other woman. During this incident, the Mother allegedly left the Child alone in the car. The Mother was arrested for burglary of a habitation.

The Department made subsequent attempts to reinitiate contact with the Mother, but she evaded their efforts again.

The Department moved to be appointed as temporary managing conservator of the Child, which the trial court granted in March 2021. The Department then placed the Child in foster care and issued a service plan to the Mother so that she could be reunified with the Child. Among other things, the service plan required the Mother to provide proof of stable housing and of employment, to submit to psychosocial and substance abuse assessments, and to refrain from all illegal criminal activity.

The Department later moved to terminate the Mother's parental rights. The Department asserted several predicate grounds for termination, including her failure to comply with the service plan.

3

During the trial on the merits, a caseworker testified that the Mother had complied with some terms of her service plan, but not all of them. The caseworker stated that the Mother had completed her psychosocial and substance abuse assessments, but the Mother was unsuccessfully discharged from other parenting and counseling programs due to her lack of participation.

The caseworker testified that the Mother had not provided proof of safe and stable housing. The caseworker indicated that, at one point, the Mother had been living with her own mother (the Child's maternal grandmother) along with her brothers (the Child's uncles), but the caseworker did not know if that information was still current. Records showed that one of the uncles had a pending case against him for burning his own daughter's private area with a blow dryer. Records also showed that the uncle was under investigation for a possible sexual assault against the Child.

The caseworker testified that the Mother had not provided proof of stable employment.

The caseworker also testified that the Mother was "erratic," "combative," and "argumentative" in her interactions with the Department. The caseworker explained that the Mother recently gave birth to a son, and that the son had been removed from her care because she tested positive for cannabinoids at the time of birth. The caseworker also said that the Mother emailed the Department on several occasions, declaring that she no longer wanted to complete her services or see her children again. More specifically, the caseworker recounted the Mother as having written that she "will not be coming to the CPS office anymore," that the Department "can keep her kids" because "they're infected," and that she is "not doing any services" because she does not want to see them. The caseworker did not sponsor a copy of these emails, but she testified that the Mother had stopped showing up for visits.

4

The Mother testified that she completed all of her services, but she admitted that she did not have completion certificates. The Mother also admitted that she was living in a hotel and not currently employed. She said that she had applied for many jobs, but her applications were rejected because a background check revealed that she had pending criminal charges. The Mother anticipated that her job prospects would improve because those criminal charges were recently dismissed. Controverting the caseworker, the Mother testified that she never emailed or informed the Department that she did not want to see her children again.

The trial court rendered a judgment that terminated the Mother's parental rights solely on the basis that she had failed to comply with the provisions of her court-ordered service plan. *See* Tex. Fam. Code § 161.001(b)(1)(O). The trial court also terminated the father's parental rights, but only the Mother has filed a notice of appeal.

**PREDICATE GROUND**

To terminate the parent-child relationship, the trial court must make two findings. *See In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). First, the trial court must find that a predicate ground for termination has been satisfied, which typically requires proof by clear and convincing evidence that the parent has either committed a prohibited act or has failed to perform a required act. *See* Tex. Fam. Code § 161.001(b)(1). If the trial court finds such a predicate ground for termination, the trial court must then find by clear and convincing evidence that termination is in the child's best interest. *See* Tex. Fam. Code § 161.001(b)(2).

The trial court here found just a single predicate ground for termination, which was the Mother's failure to comply with her court-ordered service plan. *See* Tex. Fam. Code § 161.001(b)(1)(O). In her first issue, the Mother challenges whether the evidence is sufficient to support this finding.

5

The predicate ground for termination must be supported by clear and convincing evidence, which is greater than the simple preponderance standard that applies more commonly in civil cases. *See* Tex. Fam. Code § 161.001(b)(2). Under the standard for clear and convincing evidence, the measure or degree of proof must produce in the mind of the trier of fact a firm belief or conviction that the allegation sought to be established is true. *See* Tex. Fam. Code § 101.007. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *See In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

When reviewing the legal sufficiency of the evidence in a parental termination case, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* This standard does not mean that we disregard all evidence that does not support the finding. *Id.* When deciding whether the finding is supported by clear and convincing evidence, we must also consider undisputed evidence contrary to the finding. *Id.*

In a factual-sufficiency review, we give due consideration to both the disputed evidence contrary to the finding as well as all of the evidence favoring the finding. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction. *Id.*

The Mother argues that the evidence is insufficient because there was unspecified "confusion" and because she did not understand what was required of

her under the court-ordered service plan. The Mother does not support this argument with any citation to the record, which was her burden. *See* Tex. R. App. P. 38.1(i). The argument is also controverted by the service plan itself, which used clear and simple language to require the following acts:

- The Mother "will obtain and maintain income and provide proof through pay check stubs on a monthly basis."

- The Mother "will provide child support to [the Child] in the form of material possessions/basic needs and monetary funds set by the court."

- The Mother "will participate in a Psycho-Social assessment."

- The Mother "will participate in a substance abuse assessment."

- The Mother "will provide unadulterated random urine and hair follicle samples for drug testing."

- The Mother "is expected to participate [in] all scheduled meetings including but not limited to, court, permanency conferences, family group meetings, and any other meeting pertaining to her case."

- The Mother "will refrain from engaging in any criminal activity."

- The Mother "will sign a release of information for the Texas Department of Family and Protective Services to obtain information from all past, present, and future service providers."

- The Mother "is to ensure the well-being of [the Child] by agreeing to obtain and maintain a safe and stable home environment that is free from hazards, drugs, and family violence."

All of these provisions are phrased as a positive mandates, not as mere requests. *See, e.g.*, *In re A.L.R.*, No. 21-0658, — S.W.3d —, 2022 WL 2183303, at

*4 (Tex. June 17, 2022) (per curiam) (a service plan stating that the parent "will attend individual counseling" required a specific action). And in a status hearing order, the trial court specifically found that the Mother had reviewed these mandates and that she understood what they required.

Despite arguing that she did not understand what was expected of her under the service plan, the Mother still asserts that she completed all of her services. But there was affirmative evidence to the contrary. The caseworker testified that some services had not been completed, and the Mother admitted that she had not received certain completion certificates. Also, after the caseworker testified that the Mother had not provided proof of either stable housing or employment, the Mother admitted that she was living in a hotel and that she was currently unemployed.

The Mother also suggests that the evidence is insufficient because the caseworker's testimony about her emails was never supported by copies of the emails themselves. According to the Mother, the caseworker misrepresented the email communications, and she claimed that there was never any statement that she no longer wanted to see her children. Instead, the Mother testified that she only meant to convey that she felt uncomfortable coming to visits because she could not bring her children home afterwards. Even if we accepted the Mother's version as true, there was still direct testimony that the Mother did not appear for visits, which was a violation of her service plan.

Considered in the light most favorable to the judgment, the evidence is legally sufficient to support the trial court's finding that termination of the Mother's parental rights was justified because the Mother had failed to comply with the terms of her service plan. Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted because of the Mother's

8

noncompliance. Accordingly, we conclude that the evidence is legally and factually sufficient to support the trial court's finding. *See In re C.A.L.*, No. 14-21-00543-CV, 2022 WL 553168, at \*5–6 (Tex. App.—Houston [14th Dist.] Feb. 24, 2022, no pet.) (mem. op.) (affirming a termination for failing to comply with a court-ordered service plan).

## BEST INTERESTS OF THE CHILD[1]

No specific set of facts is required to establish that termination is in the best interest of a child, but there are several nonexclusive factors that may guide the factfinder's best-interest determination. *See In re L.M.*, 57 S.W.3d 823, 837 (Tex. App.—Houston [14th Dist.] 2019, no pet.). These factors include (1) the desires of the child; (2) the child's emotional and physical needs; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) any acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017,

---

[1] The heading of the Mother's second issue is styled as a challenge to the trial court's finding that the Child's best interests are served by the termination of the father's parental rights. But the father did not file a notice of appeal, and the Mother has no standing to challenge the termination of the father's parental rights. *See In re G.V.*, No. 14-02-00604-CV, 2003 WL 21230176, at \*1 n.1 (Tex. App.—Houston [14th Dist.] May 29, 2003, pet. denied) (mem. op.) (noting that the nonparent had no standing to challenge the termination of the parents' parental rights). Setting aside the heading, the body of the Mother's brief focuses on whether the evidence is sufficient to support the trial court's finding that the Child's best interests are served by the termination of her own parental rights. The Mother has standing to bring that issue, and we consider it next.

no pet.); *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating a parent's willingness and ability to provide the child with a safe environment).

***The Child's Desires.*** The trial began shortly after the Child's fourth birthday, and because the Child did not testify, there was no direct evidence of her desires.

When there is no direct evidence of a child's desires, the factfinder may consider the child's relationship with her natural family and whether the child has bonded with her foster family. *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

There was not much evidence of the Child's relationship with her natural family. The caseworker did not personally see the Mother's interactions with the Child, but the caseworker reviewed notes saying that the interactions were appropriate and that the relationship was positive. The caseworker also testified that the Mother has taken the Child to Chuck E. Cheese.

The foster mother, who does not intend to adopt the Child, testified that the Child does not speak about the Mother. The CASA volunteer also testified that the Child is happy and well-adjusted in her current placement, and that she gets along with her other foster siblings.

***The Child's Needs.*** The Child does not have any special needs. She is enrolled in Head Start, she is meeting her milestones, and she only appears to suffer from speech delays, but even as to that last point, the evidence was conflicting.

***Danger to the Child.*** There was evidence that the Mother was in a volatile relationship with a paramour, which resulted in the paramour discharging a firearm several times indoors while the Child was present. More than a year after that incident, the Mother broke into the paramour's house, stole some items, and pepper-

10

sprayed a woman, which resulted in the Mother's arrest. The Child was left unattended in a car during the latter incident. Although there was no indication that the Mother's relationship with the paramour was still ongoing, the trial court could have reasonably concluded that the Mother's past conduct might be repeated in the future, which could endanger the Child.

There was also evidence that the Mother had lived for a period of time in the same house as her mother and brother, and that the brother might have injured his own daughter and sexually abused the Child. Even though both of those instances were still under investigation, the trial court could have likewise concluded that the Child would be in danger if she were left in the Mother's care.

***The Mother's Parental Abilities.*** The Mother cared for the Child for over three years. After the Child was placed in foster care, the Mother gave birth to another child, and that other child was also removed from the Mother's home. There was still evidence that the Mother had attended parenting classes.

***Programs.*** The evidence included references to substance abuse programs, but there was no mention of any other programs that were available to specifically assist the Mother in caring for the Child and promoting the Child's best interests.

***Plans.*** Because the foster mother did not intend to adopt, the Department plans to broadcast the Child for adoption. The Department indicated that it would consider placement with a viable relative, should one be available. The Department also indicated that it would consider broadcasting the adoption of both the Child and her younger brother together, once the younger brother has caught up on his appointments and immunizations.

***Stability of the Mother's Home.*** There was no evidence that the Mother had a lease or stable housing. According to the Mother, she was currently living in a hotel.

The Mother testified that she did not graduate from high school, and that before the pandemic, she used to work as a self-employed hair stylist and nail technician. At the time of trial, she was unemployed, but she explained that her job search was hindered by pending criminal charges. The Mother anticipated that her job search might soon become better because all of those criminal charges had recently been dismissed.

Even if the Mother were to become employed, she did not have a plan for childcare. She suggested that she might turn to the Child's father for support, but his rights were terminated. The Mother acknowledged that her own mother could not care for the Child. The Mother suggested that a friend who had "partially" raised her might be available to care for the Child, but the friend did not testify.

***The Mother's Acts or Omissions.*** There was conflicting evidence as to whether the Mother affirmatively stated that she no longer wanted to see her children. However, the evidence showed that the Mother missed some visits, and she was described as being erratic, combative, and argumentative.

Altogether, the evidence provided the trial court with a substantial basis for doubting whether the Mother's housing and income were stable, and even whether the Mother had the desire to care for the Child. Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis, and viewing all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of the Mother's parental rights was in the Child's best interest.

12

## CONCLUSION

The trial court's judgment is affirmed.

/s/    Tracy Christopher
Chief Justice

Panel consists of Chief Justice Christopher and Justices Wise and Hassan.